UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **04** CR **1 0 0 2 2** MEL |
|  | ) | CRIMINAL NO. |
| v. | ) | |
|  | ) | VIOLATION: |
|  | ) | 18 U.S.C. § 1343 (WIRE FRAUD) |
| JENNIFER MARIE SHURTS, | ) | |
|  | ) | |
| Defendant. | ) | |
|  | ) | |
|  | ) | |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### INTRODUCTION

1.      At all times material to this information, Jennifer Marie Shurts was a resident of Georgia.

2.      At all times material to this information, Communispace, Inc. was a corporation with its headquarters in Watertown, Massachusetts.

3.      At all times material to this information, AchieveGlobal, Inc. was a corporation with its headquarters in Tampa, Florida.

### OVERVIEW OF THE COMMUNISPACE SCHEME

4.      From approximately October 2000 to November 2002, Shurts was employed as a salesperson at Communispace, a start-up software company whose product is designed to enable large corporations to engage their customers in on-line "communities." Shurts' sales territory encompassed principally the Southeastern United States, which she managed out of her home in Atlanta. She reported directly to the company's President and CEO, Diane Hessan, at its headquarters in Watertown, Massachusetts. Under her employment agreement, Shurts' salary and "guaranteed" bonuses totaled approximately $180,000 a year.

5.     By the Summer of 2001, Shurts had reported to the company that she had secured large deals with five Altanta-based corporations: NDC Health, Ryder, Delta, Rare Hospitality and Bell South. She submitted to Communispace letters of intent and contracts that purported to have been signed by representatives of these companies.

6.     The projected revenue for Communispace from these deals was approximately $850,000, more than half of the company's revenue up to that point. The deals were received by the company as compelling evidence that demand for its products and services was increasing, so it began to add capacity, including hiring new staff. Later in the year, Shurts reported that she had secured other similarly-sized contracts.

7.     Despite her claimed successes, Shurts had difficulty selling the company's products, and had not in fact secured deals with any customers. Shurts knew, however, that at a small start-up company like Communispace, a salesperson with a high base salary like her would be terminated if she did not bring in significant business. In order to maintain her employment, she concealed her lack of success by falsely representing that her "customers" had in fact agreed to do business with Communispace. All the contracts and letters of intent that she had submitted to Communispace were fictitious. Shurts had forged the names of executives of her purported customers and submitted them to Communispace as though they were authentic.

8.     Once she had submitted the false contracts, she made numerous verbal misrepresentations about the supposed customers and her purported dealings with them. These representations typically included statements that the customer was excited about the product and the prospect of working with Communispace.

9.     Shurts also knew, however, that eventually Communispace would begin to inquire why the purported customers were not ready to pay Communispace or to receive its products. In

2

the Fall of 2001, to stave off Communispace's discovery of the real status of her accounts,
Shurts began to fabricate a variety of excuses about why the deals had not closed. She knew that
as long as she could string Communispace along by leading it to believe that the new business
was forthcoming, she could keep her job and continue to earn her salary. As to many of the
purported customers, she claimed that the September 11th terrorist attacks had resulted in tighter
budgets that would not allow for spending on new and novel products or services like
Communispace's.

10.     By the end of 2001, having closed no deals, Shurts informed Communispace that
she was resigning and taking a job with AchieveGlobal, another software company which had
agreed to allow her to work near her family in Southern California.

11.     Concerned about the prospect of losing an established salesperson, Hessan
convinced Shurts, however, to remain with the company by permitting her to transfer her sales
position to California, where she could cover the company's West Coast sales territory, and by
paying her moving expenses, which ultimately exceeded $10,000.

12.     Shurts nevertheless accepted the job at AchieveGlobal, unbeknownst to
Communispace, and began working there full-time on December 31, 2001, while continuing to
work in her full-time position at Communispace. She also submitted and received
reimbursement for her moving expenses from AchieveGlobal, the same expenses for which
Communispace had reimbursed her.

13.     By the Spring of 2002, still none of her Communispace deals had closed. Shurts
told the company that she had renegotiated the Delta contract, increased the size of the Ryder
business, and secured new, signed contracts with Rare Hospitality, Coca-Cola, Home Depot and
UPS. She reported that she had been working on these accounts for several months, and that she

3

had called upon old connections to obtain access to senior level decision makers. By Summer, she had reported additional deals with AFC Enterprises and Sonoco.

14.    None of the deals were real. Shurts made them up entirely as a way of continuing to receive her dual salaries from Communispace and AchieveGlobal. To support her claims, she submitted additional forged contracts and correspondence to Communispace.

15.    To further postpone the company's discovery of the real status of her accounts, Shurts reported that additional obstacles had arisen. In weekly "call" reports and "pipeline reports," which she would email to Hessan and others at the company, Shurts reported the following reasons why deals had not closed with the companies indicated:

- Ryder: The client contact was diagnosed with "Stage 3 breast cancer and when she returned, priorities had changed."

- NDC: The client contact lost her brother in the September 11th terrorist attacks and took a four-month leave of absence. The deal was handed off to other contacts, all of whom left of the company.

- UPS: Teamster contract negotiations caused the company to reassess its priorities.

- Delta: Spending freezes caused by the September 11th attacks delayed the project.

- Coca-Cola: After signing a letter of intent, the company underwent a management shake-up and four budget cuts, but still wanted to move forward with the deal.

- Bell South: The customer contact had a heart attack that forced him out of work.

All of these excuses were false.

16.    By the Summer of 2002, with Shurts' still having failed to close any deals, Communispace management became increasingly suspicious about her claims and attempted to reach out to her account contacts via the telephone numbers and email addresses Shurts had provided. Each of these contacts indeed confirmed what Shurts had been telling Communispace.

Some of the companies apologized and agreed to be billed in advance because of the delays, and Communispace obliged by sending them invoices.

17.     What Communispace did not know was that when it communicated with Shurts' customer contacts, it was actually communicating with her. Anticipating that Communispace would follow up with her supposed customers, Shurts established several phone numbers and email addresses that she passed off to Communispace as belonging to her contacts. When Communispace representatives eventually attempted to reach the contacts using these numbers and email addresses, Shurts herself answered, purporting to be the contact. To conceal her identity during the phone inquiries, Shurts used a voice-distortion device to disguise her voice, enabling her even to sound like a man.

18.     By the Fall of 2002, growing increasing concerned about Shurts' accounts, Hessan and her assistants scheduled four trips to Atlanta to follow up their phone conversations with the people they believed to be Shurts' account contacts. All of these trips, however, fell through as a result of misrepresentations by Shurts. Specifically, Shurts falsely reported that three of the meetings were cancelled by customers due to last-minute, unalterable scheduling changes. Shurts cancelled the fourth meeting the morning Hessan was to fly to Atlanta, explaining in a tearful phone call that her brother had died in a surfing accident and that she was on her way to join her family in California.

19.     The reality was that none of the meetings were ever scheduled in the first place and that Shurts' brother had not died. Shurts made up these stories as a last ditch effort to continue her employment. In approximately mid-October 2002, Communispace finally discovered that Shurts' accounts were not real, and promptly fired her.

5

## COUNT ONE
### (Wire Fraud - 18 U.S.C. § 1343)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

20.    Paragraphs 1-19 are realleged and incorporated by reference as though fully set forth herein.

21.    On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

JENNIFER MARIE SHURTS

and others known and unknown to the United States Attorney, did, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, when, on or about October 18, 2002, Shurts transmitted an email from her home in Alpharetta, Georgia to Diane Hessan in Watertown, Massachusetts in which Shurts misrepresented the status of her dealings with companies she claimed were her customers.

All in violation of Title 18, United States Code, Section 1343.

## OVERVIEW OF THE ACHIEVEGLOBAL SCHEME

22.    Shurts continued to work at AchieveGlobal after she was fired by Communispace, never informing AchieveGlobal that in fact she had been employed simultaneously by the two companies or that she had been fired by Communispace.

23.    AchieveGlobal was, and is, a purveyor of employee training software and related training services. Like her job at Communispace, Shurts' sales position at AchieveGlobal required her to acquire and maintain customer accounts in a California-based territory. The company paid her an annual salary of $60,000, plus an additional $50,000 in a guaranteed commissions, as well as any additional commissions to which she might be entitled.

24.    Shurts promoted the company's products and services principally through demonstrations at prospective customers' places of business. She typically would follow up these demonstrations by phone or in person with further sales pitches.

25.    During the Spring of 2003, Shurts made a series of presentations to two companies in her sales district, Mission Federal Credit Union and Palomar Pomerado Hospital System. During the course of her dealings with them, she reported to her supervisors that both companies appeared interested in purchasing software and related services. Despite these claims, both companies ultimately declined to enter into the contracts Shurts had proposed to them.

26.    Shurts falsely reported to AchieveGlobal, however, that both companies remained interested and that both in fact would soon sign contracts. Then on May 30, 2003 and June 28, 2003, she submitted two standard form contracts that she claimed were between AchieveGlobal and Mission Federal Credit Union, worth a total of $303,000. Both contracts purported to have been signed by Shurts, on behalf of AchieveGlobal, and by an executive at Mission Federal. On August 21, 2003, Shurts submitted what she claimed was a contract with Palomar. This contract,

7

too, purported to have been signed by Shurts and an executive of the customer, and reflected a sale of software and services of approximately $425,000.

27.    None of these contracts were real. Shurts had forged the names of executives of her purported customers and submitted them to AchieveGlobal as though they were authentic. Once she had submitted the false contracts, she made numerous verbal misrepresentations about the clients and her supposed dealings with them.

28.    Knowing that ultimately the customers would not pay for something to which they had not actually agreed and that, therefore, she would not receive a commission on the contracts, Shurts requested an advance on her commissions. AchieveGlobal agreed and paid her $42,750.49 in August 2003. When the company began to inquire about why her customers had not paid on the contracts, Shurts claimed that the payments had been misdelivered..

29.    Knowing that AchieveGlobal, like Communispace before it, would fire her once it discovered that the contracts were not real, Shurts resigned from the company, claiming on-the-job "stress," and did not return the commissions on the phony sales.

### COUNT TWO
### (Wire Fraud - 18 U.S.C. § 1343)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

30.    Paragraphs 1-28 are realleged and incorporated by reference as though fully set forth herein.

31.    On or about the dates set forth below, the defendant,

### JENNIFER MARIE SHURTS

and others known and unknown to the United States Attorney, did, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of

8

false and fraudulent pretenses, representations, and promises, transmit and cause to be

transmitted by means of wire communication in interstate and foreign commerce, writings, signs,

signals, pictures, and sounds for the purpose of executing such scheme and artifice, when, on or

about August 21, 2003, Shurts transmitted by facsimile from her home in Temecula, California a

document falsely purporting to be a sales contract between AchieveGlobal and Palomar

Pomerado Hospital System to AchieveGlobal's offices in Draper, Utah.

      All in violation of Title 18, United States Code, Section 1343.


Date: January 28 2004

                                        MICHAEL J. SULLIVAN
                                        United States Attorney

                          By:

                                          Jonathan F. Mitchell
                                        Assistant U.S. Attorney